ANTHONY ASTONE and DOROTHI ASTONE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Astone v. Commissioner
Docket Nos. 2095-76, 2107-76, 2108-76.
United States Tax Court
T.C. Memo 1983-747; 1983 Tax Ct. Memo LEXIS 37; 47 T.C.M. (CCH) 632; T.C.M. (RIA) 83747; December 15, 1983. *37 Held:
1. Anthony and Dorothi Astone are liable for the addition to tax for fraud for their taxable years 1966 through 1971, inclusive. 2. Except to the extent conceded by respondent, Anthony and Dorothi Astone received constructive dividends from Newburgh during the taxable years 1966 through 1971, as determined in the notice of deficiency. 3. Dorothi Astone received unreported rental income during her taxable years 1966 through 1971 in the amounts determined by respondent. 4. Anthony Astone received unreported compensation income from Newburgh during his 1966 and 1969 taxable years in the amounts determined by respondent. 5. Except to the extent conceded by respondent, Anthony Astone received unreported capital gains during his 1969 and 1971 taxable years, as determined in the notice of deficiency. 6. Dorothi Astone does not qualify as an innocent spouse under section 6013(e)(1) for her taxable years 1966 through 1971. Held:
1. Newburgh received unreported business income in the amounts determined by respondent. 2. Newburgh is not entitled to deductions for business expenses in excess of the amounts allowed by respondent. 3. Newburgh is not entitled to net operating *38 loss deductions for its taxable years ending September 30, 1967 and September 30, 1970. 4. Newburgh is not entitled to an equipment loss deduction for its taxable year ending September 30, 1971. 5. Newburgh is liable for the addition to tax for fraud for its taxable years ending September 30, 1965, through September 30, 1971, inclusive. Held:
1. Except to the extent conceded by respondent, Dorothi Astone realized long-term capital gain in her 1965 taxable year as determined in the notice of deficiency. 2. Dorothi Astone is not liable for the addition to tax for fraud for her 1965 taxable year. 3. Dorothi Astone is not liable for the additions to tax under section 6651(a) or 6653(a). Anthony Astone and Dorothi Astone, pro se. Thomas M. Cryan, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In the notices of deficiency mailed to petitioners on December 17, 1975, respondent determined deficiencies in petitioners' income tax and additions to tax in these consolidated cases in the following amounts: Additions to Tax
Docket Nos.
Years
Deficiency
Sec. 6653(b) [2] *39 2095-76
1966
$2,918.58
$1,459.28
1967
19,904.37
9,952.19
1968
16,338.72
8,169.36
1969
10,399.97
5,411.49
1970
39,817.15
20,679.68
1971
7,352.22
5,410.51
2107-76
1965
3,410.75
1,705.38
1966
3,498.86
1,749.43
1967
16,461.84
8,230.92
1968
15,818.51
7,909.26
1969
9,174.71
4,587.36
1970
36,307.44
20,423.84
1971
11,525.50
7,143.66
2108-76
1965
1,429.63
714.82
After concessions by the parties the following issues remain for our decision: Docket No. 2095-76
1. Whether petitioners Anthony and Dorothi Astone had unreported constructive dividend income for the taxable years 1966 through 1971, inclusive; 2. Whether Dorothi Astone had unreported rental income for the taxable years 1966 and 1968 through 1971, inclusive, in the amounts determined by respondent; 3. Whether Anthony Astone received unreported income in the form of compensation in the amounts of $364 for the taxable year 1966 and $1,200 for the taxable year 1969; 4. Whether Anthony and Dorothi Astone received unreported long-term capital gains during the taxable year 1969 and short-term capital gains during the taxable year 1971 as a result of the sale of a residence at 2501 Barcelona Drive, Fort Lauderdale, Florida; 5. Whether Anthony and Dorothi Astone are liable for the addition to tax for fraud under section 6653(b) for the taxable years 1966 through 1971 or, alternatively, whether *40 the assessment of the deficiencies against Anthony and Dorothi Astone for the taxable years 1966 and 1970 is permissible under section 6501(e)(1)(A); 6. Whether Dorothi Astone qualifies as an innocent spouse under the provisions of section 6013(e) for the taxable years 1966 through 1971; Docket No. 2107-76
7. Whether petitioner Newburgh Moving and Storage, Inc. (Newburgh), had unreported business income for the taxable years ended September 30, 1965 through September 30, 1971, in the amounts determined by the respondent; 8. Whether Newburgh had business expenses for the taxable years ending September 30, 1965 through September 30, 1971, inclusive, in the amounts determined by the respondent; 9. Whether Newburgh is entitled to net operating loss deductions in the amounts of $406.10 and $4,191.83 for its taxable years ending September 30, 1967, and September 30, 1970, respectively; 10. Whether Newburgh is entitled to an equipment loss in the amount of $2,313.34 for its taxable year ending September 30, 1971; 11. Whether Newburgh is liable for the addition to tax for fraud under section 6653(b) for its taxable years ending September 30, 1965, through September 30, 1971, or, alternatively, *41 whether the assessment of the deficiencies against Newburgh for its taxable years ending September 30, 1965, through September 30, 1970, is barred by the statute of limitations; Docket No. 2108-76
12. Whether Dorothi Astone received unreported net long-term capital gains as a result of the sale of a motel in 1965; and 13. Whether Dorothi Astone is liable for the addition to tax for fraud under section 6653(b) for the taxable year 1965, or, alternatively, whether she is liable for the additions to tax under section 6651(a)(1) and section 6653(a). FINDINGS OF FACT This case was stipulated in part and those facts are so found. The several stipulations of fact and the exhibits attached thereto are incorporated herein by this reference. Newburgh Moving and Storage, Inc. (Newburgh), petitioner in docket No. 2107-76, is a corporation with its principal office located at 615 Union Avenue, Newburgh, New York, as of the date its petition was filed in docket No. 2107-76. Newburgh was incorporated in the State of New York on May 28, 1964, and is engaged primarily in the moving and storage business. During the period from May 28, 1964, through December 31, 1971, there were 150 shares of *42 Newburgh's common stock issued and outstanding. Anthony Astone owned 50 shares, Dorothi Astone owned 50 shares and Cary Essert (Dorothi Astone's son) owned 50 shares. During this same period, Anthony Astone was the president, Cary Essert was the vice president, and Dorothi Astone was the secretary and treasurer of Newburgh. The Federal income tax returns of Newburgh for its fiscal years ending September 30, 1965, through September 30, 1971, were prepared by Philip DiPrima, a registered public accountant in the State of New York. [3] A notice of deficiency relating to those several taxable years was sent to Newburgh by certified mail on December 17, 1975. Newburgh filed its Federal income tax returns (Forms 1120) for the taxable years ended September 30, 1965, through September 30, 1971, inclusive, with the District Director of Internal Revenue, Albany, New York, on December 6, 1967, December 6, 1967, February 16, 1970, February 16, 1970, April 28, 1971, September 9, 1971, and December 20, 1971, respectively. Newburgh reported gross receipts in the following amounts on its Federal income tax returns for those taxable years: Taxable Year Ending
Reported
September 30
Gross Receipts
1965
1966
$ 46,092.33
1967
61,561.65
1968
84,698.34
1969
92,319.88
1970
205,464.88
1971
206,574.48
Anthony *43 and Dorothi Astone, petitioners in docket No. 2095-76, are husband and wife and resided at 284 S.W. 33rd Court, Fort Lauderdale, Florida, as of the date they filed their petition in docket No. 2095-76. Dorothi Astone resided at the same address as of the date she filed her petition in docket No. 2108-76. A notice of deficiency was sent to Mr. and Mrs. Astone by certified mail on December 17, 1975; said notice of deficiency resulted in the petition being filed in docket No. 2095-76. A second notice of deficiency was also sent to Mrs. Astone by certified mail on December 17, 1975; said notice of deficiency resulted in the petition being filed in docket No. 2108-76. Mrs. Astone did not file a Federal income tax return for the taxable year 1965. Mr. and Mrs. Astone filed their joint Federal income tax returns for the calendar years 1966 through 1971, inclusive, with the District Director of Internal Revenue, Albany, New York. Mr. and Mrs. Astone filed their joint Federal income tax returns for the taxable years 1969 and 1970 on April 26, 1971. The amounts of gross income stated in their Federal income tax returns for the taxable years 1969 and 1970 are $12,460 and $17,569.59, respectively. *44 In December of 1957, Dorothi Astone purchased the Taghkanic Motel in West Tacomic, New York, for $53,000. On September 10, 1959, she purchased a piece of land next to the Taghkanic Motel for $1,500, which was used as a driveway for the motel. On or about May 4, 1965, Mrs. Astone sold the Taghkanic Motel and the adjoining parcel to Robert and Eunice Keute for $60,000 and paid a $3,000 selling commission to a real estate broker as a result of the sale. Mr. and Mrs. Keute gave Dorothi Astone a second mortgage in the amount of $15,000 which bore interest at a rate of 6 percent in connection with their purchase of the Taghkanic Motel. Robert and Eunice Keute paid interest on the second mortgage to Dorothi Astone in the following amounts during the years 1965-1971: Year
Amount
1965
$450.00
1966
815.63
1967
703.13
1968
590.63
1969
478.13
1970
365.25
1971
98.81
None of these interest payments was reported on the joint Federal income tax returns filed by Dorothi and Anthony Astone for the taxable years 1966 through 1971. All of the second mortgage payments, which include both principal and interest, were made by means of checks drawn by Eunice Keute on the Long Island National Bank and made payable to *45 Mrs. Astone. Mrs. Astone endorsed each of these checks. In early 1966, Mrs. Astone used the net proceeds from the sale of the Taghkanic Motel to purchase a parcel of real estate located in Orange County, New York. Thereafter, Mrs. Astone constructed a commercial building on this tract and leased it to Newburgh. Mr. and Mrs. Astone borrowed funds from the First National Bank of Highland (First National) to finance the construction of the building. These and other loans were later secured by a mortgage on the real estate in the amount of $35,000 which was given by Mrs. Astone to First National. Although both Mr. and Mrs. Astone signed the mortgage and installment note on May 5, 1966, in favor of First National, Mrs. Astone had legal title to the property on that date, and continued to have sole legal title until the property was sold at some point after January 1, 1975. Mrs. Astone reported the gross receipts and deducted the expenses relating to the real property which was leased to Newburgh on the joint Federal income tax returns she filed with Mr. Astone for the taxable years 1966 through 1971. The first three monthly payments on the mortgage and installment note were made *46 by means of checks in the amount of $388.59 drawn on Mrs. Astone's personal checking account at First National, account No. 21-00626-8. The monthly payments on this installment note from February of 1967 through October of 1968, were made by means of a monthly debit in the amount of $388.59 to Mrs. Astone's First National account. The monthly payments on this installment note from November 1968, through December 1971, were made by means of a debit memo in the amount of $403.14 to Mrs. Astone's First National account. In 1968, Mr. and Mrs. Astone purchased a 1967 Model, 39-foot Avenger yacht for $33,112.81. Legal title to this yacht was placed in the name of Mrs. Astone. In order to purchase this yacht, Mr. and Mrs. Astone sold another boat for $12,950 which they had originally purchased in 1966 from Roland Hughes of Cornwall, New York, for $12,000. In addition, Mr. and Mrs. Astone borrowed $20,000 from First National and paid an additional $162.81 by means of a check drawn on their personal account at Highland National Bank, account No. 01-5144. The monthly payments on this loan were in the amount of $265.87 and began on September 3, 1968. Said payments were made by means of *47 checks drawn on Mrs. Astone's personal checking account at First National or checks drawn on Mr. and Mrs. Astone's joint checking account at Highland National Bank. These monthly payments continued at least through the month of May 1971. During the years 1968 through 1971, Mr. and Mrs. Astone took wintertime vacations in southern Florida. Mr. and Mrs. Astone either drove or traveled aboard their yacht to Florida and docked the yacht at the Bahia Mar Yachting Center in Fort Lauderdale, Florida. These vacations ranged in duration from 1 to 4 months depending upon Mr. Astone's business demands. During their stay at the Bahia Mar Yachting Center, Mrs. Astone had check-cashing privileges and cashed various checks at the Center to pay for miscellaneous expenses. During their stay in Florida in March of 1968, Mrs. Astone purchased two wigs from La Mae Wigs. Some time between 1967 and 1971, Mrs. Astone went on an ocean cruise with her husband aboard the Olympia. During the taxable years ended September 30, 1966, through September 30, 1971, Newburgh maintained checking accounts at Columbus Trust Company, account No. 451-295 and at First National, account No. 23-00546-1. During 1966, *48 certain checks were written on Newburgh's checking account which directly benefited Mrs. Astone. The amount of the check and the purpose of the check are as follows: Amount
Purpose
$130.00
Mrs. Astone's personal rental
payment
861.94
Repair of door on warehouse
owned by Mrs. Astone
30.51
Cleaning of Mrs. Astone's rug
$1,022.45
During 1967, certain checks were written on Newburgh's checking account for the direct benefit of Mrs. Astone. The amount and purpose of said checks are as follows: Amount
Purpose
$40.00
Cash received by Dorothi Astone
20.56
Telephone bill of Mrs. Astone
257.74
Expenses for boat owned by
Mrs. Astone
$318.30
During 1968, certain checks were written on Newburgh's checking account for the direct benefit of Mrs. Astone. The amount and purpose of said checks are as follows: Amount
Purpose
$22.45
Telephone bill of Mrs. Astone
10.38
Utility bill of Mrs. Astone
9.20
Telephone bill of Mrs. Astone
132.68
Expenses for boat owned by
Mrs. Astone
24.96
Expenses for boat owned by
Mrs. Astone
89.74
Payment of automobile loan for
automobile owned by Mrs. Astone
484.03
Repair of boat owned by
Mrs. Astone
850.00
Wedding band and other jewelry
given to Mrs. Astone
645.00
A pair of earrings and a
bracelet given to Mrs. Astone
$2,268.44
*49 During 1969, certain checks were written on Newburgh's checking account for the direct benefit of Mrs. Astone. The amount and purpose of said checks are as follows: Amount
Purpose
$21.86
Insurance for Mrs. Astone
15.22
Utility bill for Mrs. Astone
250.00
Cash received by Mrs. Astone
239.75
Expenses in connection with
boat owned by Mrs. Astone
130.25
Expenses in connection with
boat owned by Mrs. Astone
174.30
Expenses in connection with
boat owned by Mrs. Astone
57.50
Expenses in connection with
boat owned by Mrs. Astone
71.85
Expenses in connection with
boat owned by Mrs. Astone
$960.73
During 1970, certain checks were written on Newburgh's checking account for the direct benefit of Mrs. Astone. The amount and purpose of said checks are as follows: Amount
Purpose
$33.84
Expenses in connection with
boat owned by Mrs. Astone
23.68
Expenses in connection with
boat owned by Mrs. Astone
255.36
Insurance for Mrs. Astone
216.99
Insurance for Mrs. Astone
$529.87
During 1971, certain checks were written on Newburgh's checking account for the direct benefit of Mrs. Astone. The amount and purpose of said checks are as follows: Amount
Purpose
$192.61
Expenses in connection with
boat owned by Mrs. Astone
68.92
Insurance for Mrs. Astone
25.00
Expenses in connection with
boat owned by Mrs. Astone
20.60
Expenses in connection with
boat owned by Mrs. Astone
104.50
Insurance for Mrs. Astone
356.00
Insurance for boat owned by
Mrs. Astone
200.00
Insurance for Mrs. Astone
161.70
Insurance for Mrs. Astone
$1,129.33
On *50 or about December 2, 1967, Mr. Astone wrote a check in the amount of $1,900, payable to the order of Jack Zukor and drawn on the personal account of the Astones at First National. Mr. Astone used this check to purchase jewelry which he gave to his wife. In the statutory notice of deficiency issued to Newburgh, respondent determined that the corporation received business income in the amount of $5,500 from miscellaneous sales for the taxable year ended September 30, 1966. This adjustment resulted from the determination made by the agents of the respondent that an adjusting journal entry made by Newburgh's accountant should be disregarded. In this adjusting journal entry, Newburgh's accountant debited income for $6,500 and credited the loan payable account to Dorothi Astone in the amount of $6,500. Respondent's agents examined the deposit slips for Newburgh's checking accounts, the withdrawals from the savings accounts of the Astones and the checks drawn on and deposits made to the checking accounts of the Astones and determined that Mrs. Astone had loaned only $1,000 to Newburgh on September 13, 1966, as result of a $1,000 check drawn on First National and deposited into Newburgh's *51 checking account. The remaining $5,500, respondent determined, did not constitute a valid loan by Mrs. Astone to Newburgh. Special Agent Richard Collery began his investigation of Mr. and Mrs. Astone and Newburgh on July 1, 1971, on which date he first interviewed Mr. Astone. Mr. Astone stated that Newburgh was the local agent for John F. Ivory Storage Company (Ivory). As Ivory's agent, Newburgh booked jobs, did packing and made pick-ups and deliveries for that company. However, in May 1969, Newburgh purchased the operating rights of another moving company and was thereafter allowed to make its own local moves. During the interview on July 1, 1971, Mr. Astone told Special Agent Collery that all corporate receipts were deposited to the corporate checking account of Newburgh and that such corporate receipts were never cashed and were never deposited to the personal checking accounts of the Astones. Mr. Astone also stated during this interview that Mr. Philip DiPrima used the corporate bank statements, cancelled checks and check stubs in the preparation of Newburgh's income tax returns. If Mr. DiRima had any questions about the purpose of a corporate check, Mr. Astone stated that *52 Mr. DiPrima would ask him questions and he would attempt to answer said questions. Mr. DiPrima prepared the corporate income tax returns for Newburgh solely by using Newburgh's bank statements and the check stubs in Newburgh's checkbook. If a corporate receipt was not deposited into one of Newburgh's checking accounts, said deposits would not be reflected on the income tax returns of Newburgh. After interviewing Mr. Astone on July 1, 1971, Special Agent Collery reviewed the personal financial records of Mr. and Mrs. Astone and the corporate records of Newburgh. As a result of this review, Special Agent Collery determined that large deposits from an unknown source were being made in the personal checking accounts of Mr. and Mrs. Astone. Thereafter, Special Agent Collery went to the banks where the accounts were maintained and obtained the microfilm copies of the deposit slips in question. After examining these questioned deposits, Special Agent Collery discovered that corporate receipts of Newburgh were being deposited into the personal checking accounts of Mr. and Mrs. Astone. After examining the microfilm copies of these deposit slips, Special Agent Collery contacted all the *53 moving companies who had business dealings with Newburgh and confirmed that substantial amounts of corporate receipts belonging to Newburgh were either being deposited in the personal accounts of Mr. and Mrs. Astone or were being cashed. On April 10, 1972, Special Agent Collery and Revenue Agent Max Golub again met with Mr. Astone. At this interview, Special Agent Collery reminded Mr. Astone of his earlier statement on July 1, 1971, that corporate receipts were never cashed or deposited into the personal accounts of the Astones but advised him that approximately $47,000 was deposited in Mrs. Astone's checking account at First National during the year 1967. Mr. Astone stated that he did not recall depositing that amount of money in his wife's personal account but admitted, after being presented with a list of the deposit receipts, that he may have made such deposits because he needed the money to use for corporate payroll purposes. After Mr. Astone was advised by Special Agent Collery that his investigation had revealed that large amounts of corporate receipts were also deposited in personal accounts during the years 1968, 1969, and 1970, Mr. Astone again stated that he deposited *54 these items in order to pay corporate expenses. When Special Agent Collery asked Mr. Astone why he did not deposit these corporate receipts into Newburgh's account at the First National Bank of Highland, Mr. Astone could give no logical reason but asserted that there must have been some reason. At this meeting on April 10, 1972, Mr. Astone acknowledged that some of the deposits of these corporate receipts might have been made by his wife. When Mr. Astone was questioned as to whether Mr. DiPrima had been told about the deposit of corporate receipts into the personal accounts of the Astones, Mr. Astone acknowledged that he had not informed Mr. DiPrima about these deposits. During the years 1966 through 1971, Mrs. Astone received monthly statements from First National. Mrs. Astone wrote checks and also made deposits into the account she maintained at this bank. Included in these deposits made by Mrs. Astone are at least 11 deposits totaling $33,510.25. The source of these varios deposit items totaling $33,510.25 was corporate receipts of Newburgh. Newburgh received gross receipts of $13,199.35 from Ivory and received gross receipts of $29,044.21 from the United States Air Force *55 Accounting and Finance Center, Denver, Colorado, (Air Force) during the taxable year ending September 30, 1965, which were not reported on its Federal income tax return for said period. During the months of October and November 1965, Newburgh received $1,777.18 from Ivory for services rendered and $6,696.95 from Air Force for services rendered. Said amounts constituted gross receipts of the corporation but were not reported on the Federal income tax return filed by Newburgh for the year ended September 30, 1966. During the taxable year ended September 30, 1967, Newburgh received gross receipts totaling $39,835.52, which were not deposited in either of Newburgh's checking accounts. As a result they were not reported on Newburgh's income tax return; $35,430.26 was deposited in Mrs. Astone's checking account at First National, $2,449.28 was deposited in the Astone's checking account at Highland National Bank, and $1,955.98 of said corporate receipts were cashed by Mr. Astone. During the taxable year ended September 30, 1968, Newburgh received gross receipts totaling $15,853.42, which were not deposited in Newburgh's checking account and were not reported on Newburgh's income tax return *56 for that year. Of this amount, $11,521.96 was deposited in Mrs. Astone's checking account at First National, $4,111.13 was deposited in Mr. and Mrs. Astone's checking account at Highland National Bank, and $220.33 was cashed by Mr. Astone. During the taxable year ended September 30, 1969, Newburgh received gross receipts totaling $11,193.08 which were not deposited in Newburgh's checking accounts and were not reported on Newburgh's income tax return for said period. Of this amount, $5,108.88 was deposited in Mrs. Astone's checking account at First National, $2,857.56 was deposited in Mr. and Mrs. Astone's checking account at the Highland National Bank, $2,986.64 represents checks which were cashed by Mr. Astone and the remaining $240 of this amount represents cash payments which were turned over to Mr. Astone. During the taxable year ended September 30, 1970, Newburgh received gross receipts totaling $29,103.02 which were not deposited in Newburgh's checking accounts and were not reported on Newburgh's income tax return for this period. Of this amount, $2,191.65 was deposited in Mrs. Astone's checking account at First National, $7,497.79 was deposited in Mr. and Mrs. Astone's *57 checking account at Highland National Bank, $18,858.18 represented checks which were cashed by Mr. Astone and $555.40 represented cash payments which were turned over to Mr. Astone. During the taxable year ended September 30, 1971, Newburgh received gross receipts totaling $9,992.03 which were not deposited in Newburgh's checking accounts and were not reported on Newburgh's income tax return for this period. Of this amount, $868.69 was deposited in Mrs. Astone's checking account at First National, $6,803.59 was deposited in Mr. and Mrs. Astone's checking account at Highland National Bank, $774 represented checks which were cashed by Mr. Astone, $872.77 represented cash payments which were turned over to Mr. Astone and $672.98 represented a check which was made payable to Cary Essert and was cashed by Cary Essert. During The taxable year ended September 30, 1967, Newburgh received the following checks from the United States Army Finance Center, Indianapolis, Indiana, (Army) for services rendered: Date
Amount
2-10-67
$ 365.50
7-6-67
5,733.75
8-4-67
7,612.29
8-21-67
6,065.39
$19,776.93
All of the above described checks were deposited in Mrs. Astone's checking account at First National. During *58 the taxable year ended September 30, 1968, Newburgh received the following checks from Army for services rendered: Date
Amount
5-9-68
$ 224.90
3-15-68
173.70
3-1-68
131.13
3-1-68
174.00
10-27-67
3,473.85
3-19-68
862.95
$5,040.53
All of the above described checks were deposited in either Dorothi Astone's checking account at First National or in Mr. And Mrs. Astone's checking account at Highland National Bank. During the taxable year ended September 30, 1969, Newburgh received the following checks from Army for services rendered: Date
Amount
10-16-68
$307.10
10-18-68
180.91
11-12-68
169.65
5-28-69
195.10
$852.76 The checks described above were deposited in either Dorothi Astone's checking account at First National or in Mr. and Mrs. Astone's checking account at Highland National Bank. On or about October 24, 1969, Newburgh received a check in the amount of $557.88 from Army for services rendered and said check was deposited in Dorothi Astone's checking account at First National. On or about December 1, 1970, Newburgh received a check in the amount of $6,059.38 from Army for services rendered and said check was deposited in Mr. and Mrs. Astone's checking account at Highland National Bank. During the taxable *59 year ended September 30, 1967, Newburgh received various checks from Air Force for services rendered: Date
Amount
10-10-66
$ 4,722.79
1-12-67
1,370.48
2-13-67
1,932.36
2-13-67
1,482.64
9-22-67
2,397.61
$11,905.88
All of the above described checks were deposited either in Dorothi Astone's checking account at First National or Mr. and Mrs. Astone's checking account at Highland National Bank. During the year ended September 30, 1969, Newburgh received the following checks from Air Force for services rendered: Date
Amount
9-20-68
$ 140.12
10-28-68
115.56
12-10-68
580.02
12-16-68
606.35
$1,442.05 Mr. Astone received a constructive dividend during 1967 in the amount of $1,015 from Newburgh in that a check drawn on Newburgh's account at the Columbus Trust Company was used to pay Mr. Astone's liability for a loan taken out at First National.Since Newburgh deducted this check as an insurance expense on Newburgh's Federal income tax return for its taxable year ended September 30, 1968, Newburgh's taxable income is increased by $1,015 for said period. Mr. and Mrs. Astone received constructive dividends of $260 during 1968 from Newburgh because two checks in the amounts of $130 were drawn on Newburgh's checking account *60 and used to pay Mr. and Mrs. Astone's personal rent for 2 months. Since Newburgh deducted these two checks as a rent expense on Newburgh's returns for the taxable year ending September 30, 1968, Newburgh's taxable income is increased by $260 for this period. Mrs. Astone received a constructive dividend in the amount of $990 during 1968 from Newburgh because a check in said amount was drawn on Newburgh's checking account and was thereafter used to increase by $990 the balance in Mrs. Astone's checking account at First National. Mr. Astone received a constructive dividend of $1,005 from Newburgh during 1968 because a check in the amount of $1,005 was drawn on Newburgh's checking account at the Columbus Trust Company and used to pay Mr. Astone's liability for a loan taken out at First National. Since Newburgh deducted said check as an insurance expense on Newburgh's Federal income tax return for the taxable year ended September 30, 1968, Newburgh's taxable income is increased by $1,005 for said period. Mrs. Astone received a constructive dividend of $3,750 during 1970 from Newburgh because a check written on Newburgh's checking account at Columbus Trust Company was used by Mr. Astone *61 to purchase his wife a three-carat diamond engagement ring from Jack Zukor, Inc. In preparing Newburgh's income tax return for the taxable year ending September 30, 1970, Mr. DiPrima noted that the check stub for this check in the amount of $3,750 had a notation that these funds were used to purchase equipment. Accordingly, Mr. DiPrima listed this item on Newburgh's depreciation schedule for the taxable years ending September 30, 1970, and September 30, 1971. This entry resulted in Newburgh claiming depreciation deductions in the amounts of $88 for the taxable year ending September 30, 1970, and $1,026.96 for the taxable year ending September 30, 1971. Mr. and Mrs. Astone received a constructive dividend in the amount of $1,745.85 during 1970 from Newburgh because a recreational trailer was purchased for them with a check drawn on Newburgh's checking account. This recreational trailer was not used in the business by Newburgh but was used by Mr. and Mrs. Astone and Cary Essert. Mr. DiPrima, in preparing Newburgh's income tax return for the taxable year ended September 30, 1970, noted that the check stub for the check made payable to Mamzari Trailer Sales, indicated that a trailer *62 was purchased with this check. Accordingly, Mr. DiPrima put this on the depreciation schedule for Newburgh's income tax return and this resulted in a depreciation deduction in the amount of $165 being claimed for the taxable year ended September 30, 1970, and a depreciation deduction of $440.57 for the taxable year ended September 30, 1971. Mr. and Mrs. Astone received a constructive dividend of $3,488 during 1970 from Newburgh because a check drawn on Newburgh's checking account at the Columbus Trust Company was used to purchase a station wagon and title to this automobile was placed in the names of Mr. and Mrs. Astone. In preparing Newburgh's income tax return for the year ended September 30, 1970, Mr. DiPrima noted that the check stub for this check in the amount of $3,488 indicated that a station wagon was purchased. Accordingly, Mr. DiPrima put a station wagon on the depreciation schedule for Newburgh and depreciation deductions in the amounts of $82 and $962.94 were claimed on Newburgh's income tax returns for the taxable years ended September 30, 1970, and September 30, 1971, respectively. Mrs. Astone received a constructive dividend in the amount of $3,658.56 from Newburgh *63 during 1970 because a check written on Newburgh's checking account at First National in that amount was used to purchase an automobile, the title to which was placed in the name of Mrs. Astone. In preparing Newburgh's income tax return for the taxable year ending September 30, 1971, Mr. DiPrima noted that the check stub for said check in the amount of $3,658.56 indicated that an automobile had been purchased. Accordingly, Mr. DiPrima listed an automobile on the depreciation schedule of Newburgh for the taxable year ending September 30, 1971, and claimed a depreciation deduction in the amount of $742.50 for said taxable period. In April 1971, a 1965 International truck owned by Newburgh was destroyed in an accident.As a result of this accident, Newburgh received $1,200 as an insurance settlement. However, this amount was not deposited into Newburgh's checking accounts. At the time of its destruction, the truck had a remaining tax basis of $700. Newburgh's accountant made an adjusting entry to reflect this insurance recovery in which he debited the income account and credited the earned surplus account which resulted in a decrease in Newburgh's taxable income for the taxable year *64 ending September 30, 1971, by $1,200. This journal entry was incorrect. The correct entry should have reflected a gain of $500 because the truck had an adjusted basis of only $700.Mr. and Mrs. Astone received a constructive dividend of $1,200 in 1971 from Newburgh because they used for their own benefit the $1,200 received as an insurance settlement as a result of the destruction of the 1965 International truck. On August 1, 1966, a check in the amount of $250 was drawn on Newburgh's checking account and made payable to Anthony Astone. In November 1966, $114 was transferred from Newburgh's account at the Columbus Trust Company to Anthony Astone. As a result of these two transactions, Mr. Astone received salary income of $364 which he failed to report on his income tax return for the taxable year 1966. Newburgh claimed a deduction of $2,500 for the salary paid to Mr. Astone for the taxble year ending September 30, 1968, and Mr. Astone reported a salary of $2,500 from Newburgh on his 1968 Federal income tax return. Newburgh claimed a deduction of $6,400 for the salary paid to Mr. Astone for the taxable year ending September 30, 1969, and Mr. Astone reported a salary of $5,200 from *65 Newburgh on his 1969 Federal income tax return. Newburgh claimed a deduction of $10,200 for the salary paid to Mr. Astone for the taxable year ending September 30, 1970, and Mr. Astone reported salary of $10,200 from Newburgh on his 1970 Federal income tax return. Because Mr. Astone did not report the additional $1,200 paid to him by Newburgh during the taxable year ending September 30, 1969, Mr. Astone had additional salary income of $1,200 for his taxable year 1969. During the year 1970, a check was written on Newburgh's checking account in the amount of $11,000 made payable to Hainey Port of Call. Mr. Astone reported $5,000 as a bonus on his 1970 Federal income tax return as a result of this check and the respondent determined that the remaining $6,000 represented a constructive dividend received by Mr. and Mrs. Astone durig the taxable year 1970. Newburgh added this $6,000 to the basis of a truck labeled "Truck No. 8" on the depreciation schedule on its Federal income tax return for the taxable year ending September 30, 1970. Since the respondent determined that "Truck No. 8" had a tax basis of only $4,000, the respondent disallowed $1,581.23 of the $2,805 claimed as a depreciation *66 deduction on Newburgh's Federal income tax return for the taxable year ending December 30, 1970.The respondent made a similar adjustment for 1971 by disallowing $953.77 of the $1,879.35 claimed as a depreciation deduction for said truck on Newburgh's Federal income tax return for the taxable year ending December 30, 1971. In an indictment filed on April 10, 1974, Mr. Astone was charged with one count of willfully attempting to evade and defeat a large part of the income taxes due and owing to the United States of America by Newburgh for the taxable year ending September 30, 1970, in violation of section 7201, among other counts. In particular, this count alleged that Anthony Astone filed a corporate tax return for Newburgh declaring taxable income of $20,637.42, on which a tax of $4,540.23 was paid, although the actual taxable income was $53,882.54 and the tax due thereon was $20,331.80. Mr. Astone was the defendant in the criminal case of United States v. Anthony Astone, No. 74 Cr. 375, United States District Court, Southern Judicial District of New York. On October 1, 1974, Mr. Astone pleaded guilty to the charge. On October 1, 1974, the court found him guilty in accordance *67 with his plea. Newburgh normally maintained a folder for each moving job which it obtained.Prior to the trial of this case, Mr. Astone went through certain folders and made an estimate of how much was expended by Newburgh in the way of transportation expenses. Said transportation expenses consisted of expenses for gasoline, oil, tolls, weighing of customers' shipments, casual labor used for unloading shipments, repairs, maintenance of vehicles owned by Newburgh, and the meals and lodging of Newburgh's employees while these employees were traveling away from home. In order to conserve trial time, the parties agreed that Newburgh and/or Mr. and Mrs. Astone made the following expenditures for said transportation expenses: Taxable Year Ended
September 30
Amount
1966
$4,241.36
1967
4,241.36
1968
1,837.89
1969
3,885.92
1970
7,000.27
1971
4,241.36
During the taxable years ending September 30, 1967, through September 30, 1970, Newburgh incurred an unknown amount of transportation expenses. On its income tax return for the taxable year ending September 30, 1967, Newburgh claimed transportation expenses in the amount of $16,974.38. The respondent disallowed $11,274.49 of these claimed expenses. Of this *68 amount, $8,645.16 represents the amount charged off to transportation expense as a result of an adjusted journal entry made by Mr. DiPrima in regard to the petty cash account. The remaining $2,629.33 resulted from the disallowance of certain specific checks written on Newburgh's checking account at the Columbus Trust Company. Respondent disallowed these claimed expenses because of lack of substantiation. On its income tax return for the taxable year ended September 30, 1969, Newburgh claimed transportation expenses in the amount of $14,194.01. The respondent disallowed $5,175.60 of these claimed expenses for lack of substantiation. Of this amount, $2,495.35 represents the amount charged off to transportation expenses as a result of an adjusting journal entry made by Newburgh's accountant with regard to the petty cash account. The remaining $2,680.25 resulted from the disallowance of specific checks written on Newburgh's checking accounts at the Columbus Trust Company and First National. One of these checks was check No. 2324 in the amount of $500 made payable to Arkel Motors. As this check was used as a deposit on a truck purchased by Newburgh, said amount wa capitalized by *69 respondent's agents and taken into account in determining the depreciation allowable on the truck. On its income tax return for the taxable year ended September 30, 1970, Newburgh claimed expenses in the amount of $36,914.62 for subcontractors in connection with Newburgh's Government contract for the hauling of coal. The respondent disallowed $8,700 of these claimed expenses. Of this amount, $5,000 represents the amount charged off to subcontracting expenses as a result of an adjusting journal entry made by Newburgh's accountant in regard to the petty cash account. The remaining $3,700 resulted from the disallowance of two checks payable to cash in May 1970, in the amounts of $1,200 and $1,500 and one check payable to Anderson & Benson Corporation in the amount of $1,000 in September 1970. On its income tax return for the taxable year ended September 30, 1971, Newburgh claimed expenses in the amount of $33,105.40 for subcontractors in connection with Newburgh's Government contract for the hauling of coal and for the moving of furniture. Respondent disallowed $3,282.94 of these claimed expenses. Two thousand dollars of this disallowed amount represents the amount charged off to *70 subcontracting expenses as a result of a journal entry made by Newburgh's accountant in regard to the petty cash account. The remaining $1,282.94 resulted from the disallowance of certain checks charged to subcontracting expenses. Six of these checks totaled $930 and were payable either to Wayne Whitted or John Whitted. The two remaining checks were in the amounts of $110 and $242.94 and payable to Dorothi Essert and American Express, respectively. During October 1970, Newburgh paid various subcontractors for the hauling of coal with checks totaling $6,290.50.
During the taxable years ended September 30, 1966 through September 30, 1971, Newburgh wrote numerous checks to cash which were charged off to a petty cash account by Newburgh's accountant, Mr. DiPrima. The cash obtained from these checks was used primarily to pay Newburgh's weekly payroll.At the end of the taxable year, Mr. DiPrima totaled up the checks charged off to petty cash and deducted from this total the net payroll of Newburgh. The remaining amount was charged off by Mr. DiPrima to transportation expenses, supplies, exchanges, and subcontracting expenses. The amounts claimed by Newburgh on its Federal income tax *71 returns for the taxable years ended September 30, 1966 through September 30, 1971, for transportation, supplies, and subcontracting expenses as a result of checks written to petty cash were merely estimates given to Mr. DiPrima by Mr. Astone and Mr. Essert. Newburgh did not keep any documentation to support the expensing of petty cash checks to transportation, supplies, and subcontracting. Revenue Agent Max Golub, who examined the income tax returns of both Newburgh and Mr. and Mrs. Astone for the years at issue, examined the petty cash accounts set up by Mr. DiPrima and the adjusting journal entries by which Mr. DiPrima expensed payroll, transportation, supplies, subcontracting, and various other miscellaneous items. As a result of Mr. Golub's examination of Newburgh's petty cash account for the taxable year ended September 30, 1966, Mr. Golub allowed additional payroll expense in the amount of $944 but disallowed transportation expenses out of the petty cash account in the amount of $5,887.85 due to the lack of substantiation. In addition, Mr. Golub determined that Mr. and Mrs. Astone received a constructive dividend of $4,943.85 and that Mr. Astone received additional compensation *72 in the amount of $450 during 1966. Said amount being a part of the total additional payroll expense in the amount of $944. Mr. Golub examined Newburgh's petty cash account for the taxable year ended September 30, 1967, and allowed additional payroll expense of $734 and disallowed transportation expense in the amount of $8,645.16 due to lack of substantiation.In addition, Mr. Golub determined that Mr. Astone received additional compensation from Newburgh in the amount of $114 and that Mr. and Mrs. Astone received constructive dividends in the amount of $7,911.16 as a result of these various adjustments. Mr. Golub examined Newburgh's petty cash account for the taxable year ended September 30, 1968, and disallowed $12,729.95 for transportation, $5,000 for supplies due to lack of substantiation but allowed miscellaneous expenses of $137.80.As a result of these adjustments it was determined that Mr. and Mrs. Astone received constructive dividends of $18,092.15 from Newburgh during 1968. Mr. Golub examined Newburgh's petty cash account for the taxable year ended September 30, 1969, and disallowed transportation expenses in the amount of $2,495.35 and supplies in the amount of $10,000 *73 due to lack of substantiation but allowed additional miscellaneous expenses in the amount of $640.10. As a result of these adjustments, it was determined that Mr. and Mrs. Astone received a constructive dividend of $11,855.25 during 1969 from Newburgh. Mr. Golub examined Newburgh's petty cash account for the taxable year ended September 30, 1970, and disallowed transporation expenses in the amount of $10,897.87, subcontracting expenses in the amount of $5,000, supplies in the amount of $2,000, and miscellaneous expenses in the amount of $2,376.20 due to lack of substantiation. As a result of these adjustments, it was determined that Mr. and Mrs. Astone received constructive dividends of $20,274.07 during 1970, from Newburgh. Mr. Golub examined Newburgh's petty cash account for the taxable year ended September 30, 1971, and disallowed supplies in the amount of $3,000, subcontracting expenses in the amount of $2,000 and miscellaneous expenses in the amount of $6,862.54 due to lack of substantiation.As a result of these adjustments, it was determined that Mr. and Mrs. Astone received constructive dividends of $11,862.54 during 1971, from Newburgh. On April 10, 1972, Special Agent *74 Collery and Revenue Agent Golub met with Mr. Astone and his then attorney, Mr. Ryder, at an Internal Revenue Service office in Newburgh, New York. During the course of this meeting, Mr. Astone and his attorney were shown several spread sheets which had previously been prepared by Mr. Collery and Mr. Golub. Each of these spread sheets contained the check number, payee, date, and amount of all the personal checks written by Mr. and Mrs. Astone on their personal checking accounts at First National and Highland National Bank from 1966 through 1971. These spread sheets were prepared because Mr. Astone had stated that business expenses of Newburgh had been paid out of the personal checking accounts of Mr. And Mrs. Astone. In order to give credit for these payments both to Newburgh and Mr. and Mrs. Astone, these spread sheets were prepared and reviewed with Mr. Astone. Since it was impossible to determine from the information contained on many of the checks how a particular expenditure should be categorized, numerous checks were placed in a suspense column and reviewed with Mr. Astone and his attorney to determine the proper categorization. As a result of the review of these spread *75 sheets by Mr. Astone and his statements that certain checks written on the Astones' personal checking accounts were used to pay expenes of Newburgh, Newburgh was allowed additional business expenses for the taxable years ended September 30, 1966, through September 30, 1971. [4] When Mr. *76 and Mrs. Astone borrowed funds from First National, the proceeds were generally deposited into Mrs. Astone's checking account at First National. During the taxable years 1966 through 1971, Mrs. Astone received rental income from Newburgh because Newburgh was leasing the warehouse would by Mrs. Astone. Under the terms of the lease the rental payment was supposed to be $7,200 per year. However, the amount paid by Newburgh during these years varied.Mrs. Astone received net rental income in the amount of $3,063.90 for the taxable year ended September 30, 1966.Mrs. Astone sustained a loss in the amount of $419.96 in 1967 resulting from her renting the warehouse to Newburgh. Mrs. Astone received net rental income in the amount of $4,095.19 in 1968, $4,203.25 in 1969, $7,266.78 in 1970, and $1,699.05 in 1971. A check in the amount of $4,722.79, which was made payable to Newburgh and was for services rendered to the United States Air Force, was deposited in Mrs. Astone's checking account at First National in October of 1966. In the notice of deficiency issued to Anthony and Dorothi Astone on December 17, 1975, respondent determined that petitioners in docket No. 2095-76 received distributions *77 from Newburgh Moving and Storage, Inc., constituting dividend income in the following amounts; Year
Constructive Dividend
1966
$12,931.21
1967
57,596.78
1968
41,706.14
1969
25,836.42
1970
79,970.41
1971
17,783.34
Respondent also determined that petitioners received unreported rental income or loss in the following amounts: Adjusted
Year
Rental Income
1966
$2,288.90 1967
(922.13)
1968
3,608.16 1969
$5,158.75 1970
7,651.78 1971
894.68 Respondent further determined that Anthony Astone received unreported salary income from Newburgh in the amount of $364 in 1966 and $1,200 in 1969 and that petitioners received unreported long-term capital gain from Newburgh in the amount of $229.49 in 1969 and short-term capital gain of $1,946.54 during 1971 and a result of the sale of a residence in Fort Lauderdale, Florida. Finally, respondent determined that Anthony and Dorothi Astone are liable for the addition to tax for fraud under section 6653(b) for the taxable years 1966 through 1971. [5] *78 In the notice of deficiency issued to Newburgh Moving and Storage, Inc. on December 17, 1975, respondent determined that petitioner in docket No. 2107-76 received unreported business income in the following amounts during its taxable years ending September 30, 1965 through 1971: Year
Amount
1965
[6] *79 $42,243.56
1966
13,974.13
1967
39,835.52
1968
15,853.42
1969
11,193.08
1970
29,103.02
1971
9,992.03
Respondent also determined that claimed business expense deductions in the following amounts were not allowable because it was not established that the excess amounts represent ordinary and necessary business expenses or were expended for the purposes designated. Year
Claimed
Allowed
Disallowed
1966
$19,346.30
$9,113.17
[7] $10,233.13
1967
28,070.11
15,706.45
12,363.66
1968
53,851.39
24,335.66
29,515.73
1969
52,858.25
27,148.50
25,709.75
1970
107,272.87
71.017.68
36,255.19
1971
94,498.94
71,451.17
23,047.77
Respondent further determined that petitioner did not sustain net operating losses in its taxable years ending September 30, 1966 through 1969 and consequently did not have an operating loss carryover to its taxable year ending September 30, 1970. Respondent also determined that the destruction of a truck in petitioner's taxable year ending September 30, 1971, *80 produced a taxable gain of $2,813.34 instead of a loss of $2,313.34 as claimed on its return for that year. Finally, respondent determined that the section 6653(b) addition to tax for fraud was applicable for each of the 7 taxable years. [8] In the notice of deficiency issued to Dorothi Astone on December 17, 1975, respondent determined *81 that petitioner in docket No. 2108-76 realized long-term capital gain of $15,697.01 from the sale of motel premises in 1965. Respondent also determined that Dorothi Astone received unreported mortgage interest income in the amount of $450 in 1965 and that a portion of the underpayment of tax for that year was due to fraud within the meaning of section 6653(b). [9]
OPINION These consolidated cases have been pending before this Court for almost 8 years. The first trial was conducted in Miami, Florida, on November 28, 29, 30, 1979. At that time petitioners were represented by counsel. At the conclusion of the hearing the parties stated that they had reached a basis for settlement. Unfortunately, the settlement process was not concluded successfully and a second trial was *82 held on November 18, 19, 20, 1981, in Washington, D.C. At that hearing the petitioners appeared pro se. The briefing process was finally completed on July 15, 1983. Docket No. 2095-76 - Anthony and Dorothi Astone
In the notice of deficiency dated December 17, 1975, respondent determined deficiencies in Mr. and Mrs. Astone's income tax for their taxable years 1966 through 1971 and further determined that a part of their underpayment of tax for all 6 years was due to fraud.
The general rule is that the assessment of income taxes must be made within 3 years of the latter of the filing of the return for the taxable year or the due date of the return. Section 6501. The issuance of the statutory notice of deficiency suspends the running of the period of limitations. Section 6503(a)(1). The parties have stipulated that the assessment of the deficiency for 1971 is not barred by the statute of limitations in any event. However, as to the remaining 5 years in issue the normal 3-year statute of limitations expired prior to the issuance of the notice of deficiency. Therefore, unless and exception to the general rule applies, respondent may not assess the deficiencies determined for Mr. *83 and Mrs. Astone's taxable years 1966 through 1970.
Section 6501(c)(1) provides that "[i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." Thus, if we find that any part of Mr. and Mrs. Astone's underpayment of tax for their taxable years 1966 through 1970 was due to fraud within the intendment of section 6653(b), then the assessment of tax for those years is not barred by the statute of limitations.Because a finding that the addition to tax for fraud is not applicable would eliminate the need to examine the deficiencies determined for certain taxable years, [10] *84 we will consider that issue first. Addition to Tax for Fraud
Section 6653(b) provides in pertinent part: If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The burden of proving the applicability of the section 6653(b) addition to tax for fraud is on the respondent. Section 7454(a); Rule 142(b). In order to sustain this burden, respondent must affirmatively show, through clear and convincing evidence, that petitioners underpaid their taxes and that such underpayment resulted from an intentional wrongdoing designed to evade taxes believed to be owing. Cefalu v. Commissioner,276 F.2d 122 (5th Cir. 1960); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977). Although respondent need not show the exact amount of the underpayment which resulted from fraud, Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court, it must be shown by affirmative evidence that at least some fraudulent underpayment of tax in fact existed in order for respondent to prevail. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent must show that the taxpayer intended to evade taxes which he knew or believed to be owing, *85 by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court.
In resolving this issue of fraud, the Court may base its decision upon a consideration of the entire record, Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), and is not limited to considering merely the respondent's affirmative evidence. Stratton v. Commisioner,54 T.C. 255, 284 (1970); Imburgia v. Commissiner,22 T.C. 1002, 1014 (1954). Because direct evidence of fraudulent intent is seldom available, respondent may meet his burden of proof through circumstantial evidence derived from an examination of the taxpayers' entire course of conduct. Brountas v. Commissioner,73 T.C. 491, 587 (1979), revd. on other grounds 692 F.2d 152 (1st Cir. 1982); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). We have carefully examined the mass of evidence in this case and conclude that respondent has met his burden of proving by clear and convincing evidence that a part of *86 Anthony and Dorothi Astone's underpayment of tax for taxable years 1966 through 1971 was due to fraud.
While the mere understatement of income is insufficient to establish fraudulent intent, the consistent and substantantial understatements of income represents persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); United States v. Burrell,505 F.2d 904 (5th Cir. 1974); Cefalu v. Commissioner,supra;Estate of Temple v. Commissioner,67 T.C. 143, 163 (1976). In addition, fraud-- may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or ducuments, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, as any conduct, the likely effect of which would be to mislead or conceal. Spies v. United States,317 U.S. 492, 499 (1943). Respondent presented clear and convincing evidence that there was a pattern of consistent and substantial underreporting of income for the 6 taxable years involved. The difference between the income reported on petitioners' joint return and the correct *87 taxable income is as follows: Year
Reported
Correct [11]
1966
$ 775.00
$ 14,520.76
1967
502.17
55,087.01
1968
3,208.03
46,337.77
1969
4,325.00
34,661.43
1970
9,984.59
95,224.53
1971
19,395.56
19,176.16
Total
$38,190.35
$265,007.66 Another factor indicative of fraud is the method by which petitioners concealed the income diverted from Newburgh's gross receipts. See Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). Checks payable to the corporation were deposited in the personal checking accounts of the Astones or were cashed. Mr. Astone was aware that Mr. DiPrima, Newburgh's accountant, computed the corporate income solely from the deposits in Newburgh's accounts. Mr. Astone did not tell Mr. DiPrima about the diverted corporate receipts and thus they were not reflected on the corporate returns. These receipts also were not reflected on Mr. and Mrs. Astone's personal returns. Such deliberate efforts to conceal income from business activities have been held to be sufficient for imposition of the fraud addition. Estate of Kahr v. Commissioner,48 T.C. 929, 934 (1967); Federbush v. Commissioner,34 T.C. 740, 758 (1960), *88 affd. 325 F.2d 1 (2d Cir. 1963). [12]
Another significant fact indicative of fraud is the claiming of corporate business deductions for checks drawn on Newburgh's accounts whose proceeds were used for Mr. and Mrs. Astone's personal benefit. A notable example is a 1970 check in the amount of $3,750 which was used to purchase a 3-carat diamond ring for Dorothi Astone. The checkbook stub for this check bore a notation that the amount was used to purchase equipment. Because of this notation Mr. DiPrima listed the item on Newburgh's depreciation schedule and claimed depreciation deductions *89 on this "equipment." The amount was not claimed as income on Mr. and Mrs. Astone's individual return. We have held that such schemes of using corporate funds for personal purposes under the guise of paying legitimate corporate expenses is strong evidence of an intent to evade income taxes. Meyers v. Commissioner,21 T.C. 331, 348 (1953); Maggio Bros. Co. v. Commissioner,6 T.C. 999, 1008 (1946). An additional indication of fraud is the false statements made by Mr. Astone to respondent's agents. During an interview with Special Agent Richard Collery on July 1, 1971, Anthony Astone stated that all corporate receipts were deposited in Newburgh's checking accounts and that corporate receipts were never cashed and deposited in his personal checking accounts. Only after Mr. Collery conducted an investigation and presented Mr. Astone with a list of the approximately $47,000 of corporate receipts deposited into petitioners' personal accounts in 1967 did he admit that corporate receipts wer in fact diverted. In conclusion, after a thorough consideration of the record we find and hold that respondent has established by clear and convincing evidence that at least a part of the underpayments *90 of income tax due from Anthony and Dorothi Astone for each of the taxable years 1966 through 1971 was due to fraud within the meaning of section 6653(b). Constructive Dividends
On the Federal income tax returns for the taxable years 1966 through 1971, petitioner reported the following amounts as adjusted gross income: 1966
$775.00
1967
502.17
1968
3,208.03
1969
4,304.50
1970
9,984.59
1971
19,395.56
In the notice of deficiency issued to petitioners on December 17, 1975, respondent determined that unreported distributions from Newburgh constituted dividend income to petitioners in the following amounts: 1966
$12,931.21
1967
57,596.78
1968
41,706.14
1969
25,836.42
1970
79,970.41
1971
[13] 17,783.34
Section 316 defines the term dividend as any distribution made by a corporation to its shareholders out of its earnings and profits. Newburgh did not declare any formal dividends during the years in issue. Therefore, all the amounts in issue here are considered to be constructive dividends. Commissioner v. Riss,374 F.2d 161, 167 (8th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court. The constructive *91 dividends determined by respondent fall into three general categories. The first category consists of corporate receipts earned by Newburgh in its moving business but which were never deposited into its checking accounts. The second category is made up of checks drawn on Newburgh's checking accounts but which were used for the personal benefit of Anthony and Dorothi Astone. The third category represents certain amounts claimed as corporate expenses by Newburgh as a result of checks written on its petty cash account but which were determined by respondent to have been expended for petitioner's benefit. The relevant facts are as follows: During the taxable years in question the 150 shares of Newburgh's outstanding stock were owned in equal amounts by Anthony Astone, Dorothi Astone and Cary Essert, Dorothi Astone's son. The parties stipulated that the following payments received by Newburgh for services rendered were not deposited in the corporation's accounts but rather were deposited in Mr. and Mrs. Astone's accounts or were cashed by Anthony Astone. Newburgh's
Taxable Year
Ending
Amount
September 30, 1967
$39,835.52
September 30, 1968
15,853.42
September 30, 1969
11,193.08
September 30, 1970
29,103,02
September 30, 1971
9,992.03
In *92 addition, other checks payable to Newburgh were cashed by Mr. Astone and were never deposited into Newburgh's accounts. Further, cash payments from Newburgh's customers were received by Mr. Astone and were not deposited into Newburgh's accounts. The Federal income tax returns for both Newburgh and Mr. and Mrs. Astone were prepared by Philip DiPrima, a New York public accountant. He used only the corporate bank statements, cancelled checks, and check stubs in preparing the corporate returns.Mr. DiPrima admitted that if corporate receipts were not deposited into Newburgh's accounts they would not be reflected on the corporate income tax returns. Mr. Astone also admitted that he had not advised Mr. DiPrima about the corporate receipts which were deposited in his personal accounts or retained by him. Mr. Astone argues, however, that the corporate receipts in issue here were used to pay legitimate corporate expenses and were not used for his or his wife's personal benefit. Mr. Astone relies solely on his own uncorroborated testimony that hundreds of checks written on the Astone's personal accounts were used to pay corporate expenses. While we can appreciate petitioners' difficulty *93 in attempting to construct records at this late date, we not that the keeping of proper contemporaneous records would have obviated this problem. See section 1.6001, Income Tax Regs.
Mr. Astone attempted to testify from memory the specific purpose of hundreds of checks drawn on his personal accounts between 10 and 15 years before trial. We simply are unable to believe that his testimony provided anything more than a self-serving guess as to the possible use of the funds. Indeed, in some instances his testimony was directly contradicted by his wife's testimony and documentary evidence. For example, Mr. Astone testified by stipulation that check No. 191 payable to Franklin Sportswear in the amount of $91.50 was used to pay a corporate expense. However, Mrs. Astone testified and the checkbook stub corroborated that the check was used to purchase clothes. Mr. Astone also testified that check No. 195 in the amount of $50.88 was a salary advance for Cary Essert and, therefore, constituted a payroll expense. However, Mrs. Astone's testimony and the checkbook stub indicated that the check was used to purchase a rug. The second category of constructive dividends in issue were the various *94 checks drawn on Newburgh's corporate accounts which respondent determined were used for the personal benefit of Mr. and Mrs. Astone. The law is clear that if a corporation makes a payment on behalf of a shareholder, then such amount constitutes a constructive dividend to the shareholder. Benjamin v. Commissioner,66 T.C. 1084, 1115 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). The third and final category of constructive dividends determined by respondent consists of numerous corporate checks changed to Newburgh's petty cash account. The cash obtained from these checks were used primarily to pay Newburgh's weekly payroll. At the end of the taxable year, Mr. DiPrima deducted the net payroll from the total amount of checks charged to petty cash. The remaining amount was charged to transportation expenses, supplies, exchange and subcontracting expenses in accordance with the estimates provided by Anthony Astone and Mr. Essert. There was no documentation available to support the expensing of these amounts to the various categories. Respondent disallowed the additional amounts charged off to these miscellaneous items for lack of substantiation. Petitioner's conclusory testimony to *95 the effect that these amounts were used to pay additional corporate expenses does not show otherwise. Except to the extent conceded by respondent, we hold that petitioners received constructive dividends from Newburgh during the years 1966 through 1971, as determined by respondent. Unreported Rental Income
The next issue for our decision is whether petitioner Dorothi Astone had unreported rental income for her taxable years 1966-1971. Mrs. Astone owned a warehouse which was leased to Newburgh during those years. Respondent determined that petitioners Dorothi and Anthony Astone failed to report the following amounts of net rental income on their joint returns. Adjusted
Year
Rental Income
1966
$2,288.90 1967
(922.13)
1968
3,608.16 1969
5,158.75 1970
7,651.78 1971
894.68 Petitioner did not introduce any evidence to rebut respondent's determination on this issue but rather argued that assessment of deficiencies for those years is barred by the statute of limitations. Section 6501. Because of our finding that a part of petitioner's underpayment of tax for the years 1966 through 1971 was due to fraud, the deficiency for those years may be assessed at any time. Section 6501(c)(1). Respondent's *96 determination is sustained. Unreported Compensation Income
The next issue is whether petitioner Antony Astone received unreported income from Newburgh in the amounts of $364 and $1,200 during his 1966 and 1969 taxable years, respectively. The following facts are undisputed by the parties. On August 1, 1966, a check in the amount of $250 was drawn on Newburgh's checking account and made payable to Mr. Astone. In November of 1966, the amount of $114 was transferred from Newburgh's account at the Columbus Trust Company. Mr. Astone did not report any salary income on his 1966 joint Federal income tax return. Accordingly, respondent determined that petitioner received total unreported salary income of $364 in 1966. Newburgh claimed a business expense deduction of $2,500 for salary paid to Mr. Astone for its taxable year ending September 30, 1968, and Mr. Astone reported salary income of $2,500 from Newburgh on his 1968 return. For its taxable year ending September 30, 1969, Newburgh claimed a deduction of $6,400 for salary paid to Mr. Astone and Mr. Astone reported salary income of $5,200 from Newburgh on his 1969 return. Newburgh claimed a deduction of $10,200 for salary paid to *97 Mr. Astone for its taxable year ending September 30, 1970, and Mr. Astone reported $10,200 in salary from Newburgh on his 1970 return. Respondent determined that Mr. Astone had additional unreported salary income of $1,200 for his 1969 taxable year. Again, petitioner relies solely on his argument that assessment of tax for 1966 and 1969 is barred by the statute of limitations and failed to introduce any evidence to rebut respondent's determination. Our finding of fraud for the taxable years in issue permits assessment of tax at any time. Section 6501(c)(1). Respondent's determination is sustained on this issue.
Unreported Capital Gains
In the notice of deficiency respondent determined that Antony Astone received distributions from Newburgh totaling $26,596.50 in 1969 of which $25,836.42 was determined to constitute ordinary dividend income. Of the remaining 760.08, $301.10 was determined to be return of capital and 458.98 was determined to be capital gain. After applying the deduction provided by section 1202, the resulting gain recognized was $229.49. [14] Respondent's concession that petitioners did not receive certain constructive dividends totaling $291.72 for the taxable year *98 1969 reduces the realized capital gain to $167.26. After taking into account the section 1202 deduction, the resulting recognized gain is $83.63, rather than the $229.49 originally determined. Respondent also determined that Mr. and Mrs. Astone realized short-term capital gain of $3,273.88 for their 1971 taxable year from the installment sale of premises known as 2501 Barcelona Drive in Fort Lauderdale, Florida, in lieu of the $1,327.34 reported on their return. On brief, respondent conceded that petitioner's taxable income should be increased by only $967.21 rather than the amount of $1,946.54 determined in the notice of deficiency. Respondent's determinations as adjusted by the concessions as described above must be sustained here. Petitioners introduced no evidence on these issues and did not address them on brief except to argue that assessment is barred by the statute of limitations. As we have concluded that petitioner's underpayment of tax for 1969 and 1971 was due to fraud, assessment *99 may be made at any time. Respondent is sustained on this issue. Innocent Spouse
We next consider petitioners' argument that Dorothi Astone qualifies as an innocent spouse under section 6013(e)(1) for her taxable years 1966 through 1971. That section provides as follows: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return. (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be *100 relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. Mrs. Astone bears the burden of proving that she qualifies for the benefit of this exculpatory provision. Adams v. Commissioner,60 T.C. 300, 303 (1973); Sonnenborn v. Commissioner,57 T.C. 373, 381 (1971). She must prove (1) that omitted amounts in excess of 25 percent of the amount of gross income stated in the return were attributable to Anthony Astone; (2) that she did not know and had no reason to know of such omissions; and (3) that it is inequitable to hold her liable for the deficiency in tax attributable to such omissions. Because she must prove all three elements in order to be entitled to the benefits of section 6013(e)(1), failure of proof on any of them eliminates any need on our part to consider the other elements. We will first consider whether Dorothi Astone has established that in signing the returns she did not know of, and had no reason to know of the omissions in income. Section 6013 (e)(1)(B). Petitioner argues that Mrs. Astone was a chronic alcoholic and was not aware *101 of the financial dealings of her husband or of Newburgh. Petitioner further argues that because evidence to that effect is uncontroverted, the burden of proof as to this element has been met. We do not concur with petitioner's evaluation of the sufficiency of the evidence on this point. Mrs. Astone testified that she drank heavily during the years in question and other witnesses corroborated that fact. She also testified that she was under a doctor's care for this problem and that she was unable at times to recall things that happened. While this testimony remains uncontroverted we are unable to find the requisite nexus between her illness and a lack of knowledge of the omitted income. To the contrary, we believe the evidence clearly shows that Mrs. Astone knew or at least had reason to know of the omissions of income. During the years 1966 through 1971, corporate receipts of Newburgh totaling $59,844.23 were deposited in Mrs. Astone's checking account at the First National Bank of Highland. She received monthly bank statements, wrote checks on the account, and made out at least 11 deposit slips of diverted corporate funds totaling $33,510.25. During the years 1967 through *102 1971, additional corporate receipts totaling $23,718.35 were deposited in Mr. and Mrs. Astone's checking account at Highland National Bank. We think this diversion of corporate receipts alone is sufficient evidence for us to conclude that Dorothi Astone should have known of the omissions from income reported on her joint return. She has not presented sufficient credible evidence which would permit us to conclude that she did not have knowledge of the omissions. Because of her failure of proof we need not consider the other elements of section 6013(e)(1). Docket No. 2107-76 Newburgh Moving and Storage, Inc. Unreported Business Income
Respondent determined that Newburgh received the following amounts of unreported business income: Taxable Year Ending
September 30
Amount
1965
$42,243.56
1966
13,974.13
1967
39,835.52
1968
15,853.42
1969
11,193.08
1970
29,103.02
1971
9,992.03
Newburgh filed a Federal income tax return for its taxable year ending September 30, 1965, but reported no gross receipts or deductions on that return. However, Newburgh received gross receipts of $13,199.35 from John F. Ivory Storage Company and gross receipts of $29,044.21 from the United States Air Force during that taxable *103 year. During October and November of 19658 Newburgh received $1,777.18 from John F. Ivory Storage Company and $6,696.95 from the United States Air Force. These amounts were not reported on Newburgh's income tax return for the taxable year ending September 30, 1966. Respondent also determined that Newburgh received additional gross receipts from miscellaneous sales in the amount of $5,500 for that taxable year. The amounts determined by respondent as constituting additional unreported business income for Newburgh's taxable years ending September 30, 1967 through 1971, correspond to the corporate receipts which were deposited into the personal checking accounts of Mr. and Mrs. Astone or were otherwise received by Mr. Astone. Respondent also determined that corporate sales receipts were overstated for Newburgh's taxable years ending September 30, 1967, September 30, 1969, and September 30, 1971, and were understated for the taxable years ending September 30, 1968, and September 30, 1970. No credible evidence has been introduced to support a finding that any of these adjustments are in error. [15] Accordingly, respondent's determination is sustained. Browne v. Commissioner,73 T.C. 723, 730 (1980). *104 Newburgh's Business Expenses
The next issue for our consideration is whether Newburgh incurred deductible business expenses in excess of the amounts allowed by respondent. Respondent disallowed the following amounts of claimed business expenses for the years in issue: Taxable Year Ending
September 30
Amount
1965
[16] *105 $ (20,740.17)
1966
3,414.58 1967
10,878.67 1968
27,901.25 1969
25,002.40 1970
36,117.46 1971
23,047.77  We do not deem it necessary to describe in detail the mechanics of respondent's *106 computation of the amounts of disallowed business expenses. Essentially, the disallowed amounts consist of claimed business expense deductions which respondent determined were used for the personal benefit of Mr. and Mrs. Astone and thus constitute constructive dividends rather than legitimate business expense deductions. All of these claimed business expenses were disallowed for failure to substantiate that the expenditures were made for the purposes designated on the corporate returns. For example, one of the more egregious items was a 3-carat diamond ring purchased with corporate funds in 1970 for $3,750 which was given to Mrs. Astone for her personal use and claimed as a depreciable asset on Newburgh's returns for its taxable years ending September 30, 1970, and September 30, 1971. Another group of disallowed business expenses relate to Newburgh's practice of writing numerous checks to cash during each taxable year.At the end of each year the accountant allocated this amount to payroll expenses and to other expense categories such as transportation, supplies, subcontracting, and other miscellaneous expenses. No records were kept of the amounts actually expended for these purposes *107 and thus the amounts allocated to these latter categories were based on estimates provided by Mr. Astone and Cary Essert. [17] These estimated amounts were disallowed because no showing was made that these funds were used to pay Newburgh's ordinary and necessary business expenses. In addition, certain of these expenses described by the accountant as transportation expenses, convention expenses, and conference dues were disallowed for the additional reason that Newburgh failed to meet the strict substantiation requirements of section 274(d). The parties stipulated that Newburgh and/or Anthony and Dorothi Astone made the following expenditures in connection with various moving jobs: Taxable Year Ending
September 30
Amount
1966
$4,241.36
1967
4,241.36
1968
1,837.89
1969
3,885.92
1970
7,000.27
1971
4,241.36
It was also stipulated that these amounts were expended for gasoline, oil, tolls, weighing of customer shipments, casual labor for unloading shipments, and the meals and lodging of Newburgh's employees while the employees *108 were traveling away from home. It is respondent's position that most of these expenses have not been substantiated as required by section 274(d) and that the expenditures for gasoline, oil, and other miscellaneous expenses have already been allowed in the notice of deficiency. Petitioner's evidence relating to these expenses consisted of Mr. Astone's uncorroborated and vague testimony that these disallowed amounts were, in fact, additional legitimate business expenses. Gilman v. Commissioner,72 T.C. 730, 746-749 (1979). Additionally, no documentary evidence has been introduced to satisfy the strict substantiation requirements of section 274(d). [18] *109 Respondent's determination is sustained. Net Operating Loss
Newburgh claimed a net operating loss deduction of $406.10 for its taxable year ending September 30, 1967, based on an alleged net operating loss of $760.74 carried forward from the previous year. On its Federal income tax return for the taxable year ending September 30, 1970, Newburgh claimed a net operating loss of $4,191.83 on the basis of alleged net operating losses carried forward from the previous four taxable years. We have sustained respondent's determination that Newburgh understated gross receipts and overstated business expenses during the taxable years in issue. Accordingly, we must sustain respondent's disallowance of Newburgh's claimed net operating losses. Equipment Loss
Newburgh claimed an equipment loss in the amount of $2,313.34 on its Federal income tax return for the taxable year ending September 30, 1971, on the basis that a 1965 International truck was destroyed in an accident in April of 1971. Newburgh received $1,200 as an insurance settlement relative to this accident *110 but said amount was never deposited in the corporation's checking account. As the truck had an original cost of $6,700 and accumulated depreciation on the truck totaled $6,000 at the time of the accident, the remaining basis in the truck was $700.Accordingly, respondent determined that Newburgh realized a gain of $500 pursuant to the receipt of the $1,200 in insurance proceeds. Sections 1001, 1016. Because the truck constitutes "section 1245 property" the gain determined by respondent is ordinary income as provided by section 1245(a). Based on the record respondent's determination is sustained. Fraud
Respondent determined that Newburgh is liable for the addition to tax for fraud under section 6653(b) for its taxable years ending September 30, 1965, through September 30, 1971, inclusive.
Because a corporation can act only through its officers, it is liable for the addition to tax for fraud if the corporate officer has the fraudulent intent to evade the corporation's taxes. Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963); Auerbach Shoe Co. v. Commissioner,21 T.C. 191, 194 (1953), Laputka v. Commissioner, T.C. Memo. 1981-730, 43 T.C.M. at 191. *111 Respondent bears the burden of proving the existence of fraud by clear and convincing evidence. Rule 142(b); Section 7454. We have carefully considered the record in this case and conclude that respondent has proved by clear and convincing evidence that at least portion of the underpayment of corporate taxes for all the years in issue was due to fraud. The facts are clear that thousands of dollars of corporate receipts were not deposited in the corporate bank accounts but rather were deposited in Mr. and Mrs. Astone's personal accounts. Mr. and Mrs. Astone each owned one-third of Newburgh's stock. Mr. Astone knew that if Newburgh's gross receipts were not deposited in the corporate bank accounts those receipts would not be reflected on the corporate income tax return because only the corporate accounts were made available to the accountant. [19] *112 Petitioner's argument that these gross receipts were deposited in the Astone's personal accounts in order to avoid the bank's imposition of a 10-day hold on those amounts is simply unbelievable. First, petitioner has not provided any credible evidence that the bank imposed a 10-day hold on the corporate accounts and not on the Astones' personal accounts. As with most of the positions taken by petitioners in these cases, we have only the *113 unsupported and conclusory testimony of Mr. Astone as evidence. Second, if in fact the Astone's personal accounts were used as alternative corporate accounts then surely the accountant would have been allowed access to those accounts.In short, we find petitioners' story patently incredible. Newburgh's failure to report these diverted gross receipts during the 7-year period in issue constitutes a pattern of consistent and substantial underreporting of its income and is strong evidence of fraud. Merritt v. Commissioner,301 F.2d 484 (5th Cir. 1962). We believe that record clearly shows that Mr. Astone had knowledge that gross receipts of Newburgh went unreported during the 7-year period and that the resulting underpayment of tax was due to fraud with the intent to evade tax within the meaning of section 6653(b). [20]
Docket No. 2108-76 Dorothi Astone
The final issues for our decision involve petitioner Dorothi Astone's sale *114 of the Taghkanic Motel in 1965 and respondent's determination that part of the underpayment of tax for that year was due to fraud within the meaning of section 6653(b). Dorothi Astone purchased the Taghkanic Motel in West Tacomic, New York, in December of 1957 for $53,000. [21] On September 10, 1959, the purchased an adjoining parcel of land which was used as a driveway for the motel for $1,500. On or about May 4, 1965, Mrs. Astone sold the Taghkanic Motel and the adjoining parcel to Robert and Eunice Keute for $60,000 and paid a $3,000 selling commission to a real estate broker as a result of the sale. The buyers gave Dorothi Astone a second mortgage in the amount of $15,000 which bore 6 percent interest in connection with their purchase of the Taghkanic Motel. Robert and Eunice Keute paid the following amounts of interest on the second mortgage during *115 the years 1965-1971: Year
Amount
1965
$450.00
1966
815.63
1967
703.13
1968
590.63
1969
478.13
1970
365.25
1971
98.81
Dorothi Astone did not file a Federal income tax return for the taxable year 1965. [22] None of the interest payments on the second mortgage was reported on the joint returns filed by Dorothi and Anthony Astone for the taxable years 1966 through 1971. All of the second mortgage payments (principal and interest) were made by means of checks made payable to and endorsed by Dorothi Astone. In the December 17, 1975, notice of deficiency issued to Dorothi Astone, respondent determined that she realized a long-term capital gain of $15,697.01 [23] from the sale of the Taghkanic Motel in 1965. Applying the 50 percent deduction provision of section 1202 respondent determined that $7,848.50 of that amount constituted taxable income. Respondent further determined that petitioner received taxable interest income on the second mortgage of $450 in that year and that the imposition of the addition to tax for fraud was appropriate. Dorothi Astone's tax liability was *116 computed on the basis of a married person filing a separate return. Respondent has conceded that Dorothi Astone expended $1,500 for the acquisition of land for a driveway for the motel and $3,000 in sales commission, thus reducing the long-term capital gain to $11,197.01 and resulting taxable income from the sale to $5,598.50. At trial, Anthony Astone testified that he and his wife incurred legal fees of $1,000 in connection with the sale of the motel in 1965 and that they conveyed certain personal property and made various capital improvements to the motel during the 7 years that Mrs. Astone owned it, as follows: Sign
$2,000
Hot Water Heater
450
Closets
550
Well
650
12 Air Conditioners and
11 Televisions
3,500
Flooring
800
Lawn Mowers
775
Television Antenna
375
Landscaping
700
Appliances
1,850
Total
$11,650
On *117 brief, petitioner argues that the selling price of $60,000 should be reduced by the total amount expended on capital improvements and the $1,000 legal fee. Petitioner also argues that the selling price should be reduced by the amount of $4,140 which constitutes the portion of the property owned by the Estate of Millie Paulikowski plus interest "representing a liability of Dorothi Astone with respect to the subject property." Petitioner further argues that respondent erred in reducing Dorothi Astone's cost basis in the property for depreciation in the amount of $8,697.01 because she had never claimed any deductions for depreciation during the taxable years she owned the motel. Accordingly, petitioner argues that the sale of the Taghkanic Motel in 1965 resulted in a loss rather than a gain as determined by respondent.
Section 1016(a)(2) provides in pertinent part as follows: SEC. 1016. ADJUSTMENTS TO BASIS. General Rule.--Proper adjustment in respect of the property shall in all cases be made-- * * * (2) in respect of any period since February 18, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount -- (A) allowed as deductions *118 in computing taxable income * * * but not less than the amount allowable under this subtitle or prior income tax laws. Where no method has been adopted under section 167 (relating to depreciation deduction), the amount allowable shall be determined under section 167(b)(1). [Emphasis added.] The law is clear that the basis of depreciable property must be reduced by the amount of depreciation allowable even though the taxpayer did not take a depreciation deduction during the time the property was owned. United States v. Ludey,274 U.S. 295 (1927); Collins v. Commissioner,18 T.C. 99, 103 (1952), affd. 203 F.2d 565 (6th Cir. 1953). In computing the depreciation allowable respondent assigned a useful life of 33-1/3 years to the deprecialble portion of the property and utilized the straight line method under section 167(b)(1). Section 1.1016-3(a)(2)(i), Income Tax Regs. This method resulted in a reduction of 3 percent per annum for the 7 years and 5 months that Mrs. Astone owned the motel. While it is unfortunate that petitioners did not take advantage of claiming deductions for depreciation on the motel from 1957 to 1965, the mandate of the statute is clear that the depreciable basis *119 of the property must be so reduced. Petitioners have not argued that respondent's allocation of basis between depreciable and nondepreciable assets was improper or that the useful life of 33-1/3 years selected by respondent was too short. Thus, we must conclude that the reduction of basis for allowable depreciation as computed in the notice of deficiency must be sustained. Petitioner further contends that the selling price of the motel should have been reduced by a legal fee paid by Dorothi Astone of $1,000 incident to the closing as well by a $4,140 payment made to the Estate of Millie Paulikowski. The copy of the May 4, 1965, closing statement introduced into evidence makes no mention of a legal fee paid by Dorothi Astone. The sole evidence supporting petitioner's position is Anthony Astone's unsupported testimony that a fee in that amount was paid.No explanation was given as to why evidence substantiating the payment of this fee could not be obtained from the attorney whose name and address appears on the closing statement. We are, therefore, unable to find that petitioner has met her burden of proof on this item.Rule 142(a). The closing statement does, however, reflect that *120 a payment of $4,140 was made to the Estate of Millie Paulikowski from the sale proceeds of the motel. Petitioner argues that $3,000 of this amount represents the portion of the property owned by the estate and $1,140 represents interest due. There was no evidence presented that this liability represented a cost incurred in connection with Dorothi Astone's acquisition of the property in 1957. Therefore, we are unable to find that the amount of this liability should be added to her tax basis in the property. [24]
Finally, petitioner contends that she made certain capital improvements to the property and conveyed personal property with the motel in 1965 totaling $11,650. Again, the only evidence appearing in the record is the testimony of Anthony Astone which was to some extent vaguely corroborated by the testimony of Dorothi Astone's son, Cary Essert. Dorothi Astone did not testify on this point and no documentary evidence was supplied to support petitioner's contention. We must agree with respondent that petitioner has not met her burden *121 of proof of this issue. [25] Finally, we must decide whether petitioner Dorothi Astone is liable for the addition to tax for fraud under section 6653(b) for the 1965 taxable year. Respondent bears the burden of proving, by clear and convincing evidence, that some part of the underpayment of tax for that year was due to fraud. Section 7454(a); Rule 142(b). Respondent must affirmatively show that petitioner underpaid her taxes and that such underpayment resulted from an intentional wrongdoing designed to evade taxes believed to be owing. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Stone v. Commissioner,56 T.C. 213, 220 (1971). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Although fraud may never be presumed to exist, Beaver v. Commissioner,55 T.C. 85, 92 (1970), *122 it may be proved by circumstantial evidence because direct proof of the taxpayer's intent is seldom available. Brountas v. Commissioner,73 T.C. 491, 587 (1979). revd. on other grounds 692 F.2d 152 (1st Cir. 1982); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). After a careful consideration of the record pertaining to petitioner Dorothi Astone's sale of the Taghkanic Motel in 1965, we are unable to conclude that respondent has proved by clear and convincing evidence that a part of her underpayment of tax for that year was due to fraud. While we have held that petitioner has not met her burden of proving that respondent's computation of gain was in error, such failure does not constitute proof of fraud. Pigman v. Commissioner,31 T.C. 356, 370 (1958); Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). Respondent points to the stipulated fact that petitioner received $450 in interest in 1965 on the second mortgage given by the buyers of the motel and additional unreported interest amounts during the years 1966 through 1971. Respondent argues that because 1965 was the first of 7 years that Mrs. Astone failed to report this interest income that we *123 should find fraud for 1965. While it is true that consistent and substantial understatements of taxable income can be persuasive evidence of fraud, Cefalu v. Commissioner,276 F.2d 122, 129 (5th Cir. 1960); Estate of Temple v. Commissioner,67 T.C. 143, 163 (1976), the record on this issue leaves us with significant doubt that Mrs. Astone possessed the requisite intent to evade taxes necessary for the imposition of the section 6653(b) addition to tax for her 1965 taxable year. Thus, we hold that petitioner is not liable for the addition to tax for fraud. Respondent pled alternatively in his Answer to the Petition that Mrs. Astone is liable for the addition to tax for failure to file a return under section 6651(a) and the addition to tax for negligence under section 6653(a). Inasmuch as these issues were not raised in the notice of deficiency, they constitute new matters upon which respondent bears the burden of proof. Rule 142(a). However, unlike the issue of fraud where respondent's burden of proof must be carried by clear and convincing evidence, Rule 142(b), respondent's burden on these other additions to tax may be met by merely a preponderance of the evidence. This means *124 that respondent must introduce sufficient evidence to make a prima facie showing and overcome the evidence submitted by petitioner that her failure to file a return for 1965 was not due to reasonable cause but was due to willful neglect and that her failure to pay her tax liability for that year was due to negligence or intentional disregard of rules and regulations. See Lyon v. Commissioner,1 B.T.A. 378, 379 (1925). Respondent's evidence consisted of proving that Mrs. Astone sold a motel in 1965 and did not file a return for that year reporting the gain from the sale as well as $450 earned from a second mortgage. Petitioner's evidence consisted of testimony to the effect that no gain was realized from the sale because of personal property conveyed with the motel and capital improvements made to the premises during the period of ownership. While we have held that this unsupported testimony was not sufficient to meet her burden of proof on this issue we are unable to find that respondent has met his burden of proving either that petitioner's failure to file a return was not due to reasonable cause or that her failure to pay her tax liability was due to negligence.It is possible *125 that Mrs. Astone believed that she realized a loss on the motel and that, therefore, even though she received $450 in interest she was not required to file a return. On these facts we hold that the imposition of the additions to tax under sections 6651(a) and 6653(b) is not appropriate here. To reflect the forgoing, Decisions will be entered under Rule 155 in docket Nos. 2095-76 and 2108-76.
Decision will be entered for the respondent in docket No. 2107-76.
Footnotes
1. By our Order dated March 22, 1978, the following cases were consolidated for purposes of trial, briefing, and opinion: Anthony Astone and Dorothi Astone, docket No. 2095-76; Newburgh Moving and Storage, Inc., docket No. 2107-76; and Dorothi Astone, docket No. 2108-76.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All references to "Rules" are to the Tax Court Rules of Practice and Procedure.
3. Petitioner Anthony Astone is Mr. DiPrima's nephew.↩
4. These amounts are set forth on schedules 3, 5, 6, 7, 8, and 9 in the notice of deficiency issued to Newburgh. Many of these items can be traced directly to checks listed on the spread sheet and were reclassified as corporate expenses by the agents of the respondent. For example, for the taxable year ended September 30, 1966, the additional allowance of taxes in the amount of $369.64 can be traced to check No. 112 in the same amount whick is payable to the New York State Unemployment Insurance Fund. The additional allowance of $7.14 for miscellaneous expenses for the same period can be traced to check No. 299 payable to Diana Mitchell for the same amount. Many additional checks, which were allowed as deductions, can be traced either to individual checks or a combination of checks listed on the spread sheets and subsequently classified as corporate expenses paid by the Astones on behalf of Newburgh.↩
5. The following issues or parts of issues have been settled or conceded by the parties in docket No. 2095-76. Petitioners concede that they received certain constructive dividends from Newburgh totaling $294.39, $518.30, $2,540.47, $3,032.30, $529.87, and $1,129.33 during the taxable years 1966, 1967, 1968, 1969, 1970, and 1971, respectively. Respondent concedes that Mr. and Mrs. Astone did not receive certain alleged constructive dividends from Newburgh totaling $253,95, $392.94, $375.19, $291.72, $297.50, and $219.40 during their taxable years 1966, 1967, 1968, 1969, 1970, and 1971, respectively. Petitioners concede that they failed to report on their income tax returns for the taxable years 1966 through 1971, inclusive, interest income received by Mrs. Astone from Robert and Eunice Keute during said years. Petitioners concede that the assessment of the deficiency against them for the taxable year 1971 is not barred by the statute of limitations.↩
6. The amounts determined for 1965 and 1966 were both decreased by 63.3 percent or $26,940.17 and $8,474.13, respectively, representing estimated business expenses attributable to such income. 7. These amounts determined for petitioner's fiscal years 1966 through 1970 were reduced by $1,454.42, $1,484.99, $1,614.48, $707.35, and $137.73, respectively, representing allowable business expense deductions not claimed on its returns for those years.↩
8. The following issues or parts of issues have been conceded by the petitioner in docket No. 2107-76: Newburgh is not entitled to certain claimed business expenses totaling $263.88, $548.00, $1,164.71, $5,321.21, $134,37, and $1,601.68 for its taxable years ended September 30, 1966, 1967, 1968, 1969, 1970, and 1971, respectively. Newburgh received business income in the amount of $42,243.56, which it failed to report on its income tax return for the taxable year ending September 30, 1965. The assessment of the deficiency against Newburgh for the taxable year ended September 30, 1971, is not barred by the statute of limitations. We note that respondent specifically does not concede that Newburgh is entitled to business deductions as a result of the concessions made by the respondent in regard to certain constructive dividends in docket No. 2095-76.↩
9. The following issues or parts of issues have been conceded by the parties in docket No. 2108-76: Dorothi Astone received unreported interest income of $450 in 1965. Respondent concedes that petitioner expended $1,500 for the acquisition of land for a driveway for the motel and incurred a $3,000 sales commission expense in connection with the sale of the motel thus reducing the long-term capital gain to $11,197.01.↩
10. Respondent argues alternatively that assessment of the deficiencies for 1969 and 1970 is not barred because petitioners' returns for those taxable years were both filed on April 26, 1971, and that the 6-year statute of limitations under section 6501(e)(1)(A) is applicable because of the omission of gross income in excess of 25 percent of the gross income stated on the returns. Benjamin v. Commissioner,66 T.C. 1084, 1099 (1976), affd. 592 F.2d 1259↩ (5th Cir. 1979).
11. These figures include concessions made by respondent in regard to constructive dividends and long-term capital gains.↩
12. Petitioners argue that the errors on their returns were due to mistakes made by their accountant and poor recordkeeping and thus only negligence was involved. We think the evidence is clear that inadequate records were essential to the fraudulent scheme employed here and that Mr. Astone's failure to communicate with Mr. DiPrima was deliberate and not within the province of negligence. This diversion of corporate receipts clearly qualifies as an "independent act of misrepresentation of concealment." See Marsellus v. Commissioner,544 F.2d 883, 886↩ (5th Cir. 1977), affg. a Memorandum Opinion of this Court.
13. Respondent has conceded that certain small amounts do not constitute dividend income. See fn. 5, supra.↩
14. We note that in the explanation portion of the notice of deficiency the figure stated for recognized gain is $279.49. However, the correct figure of $229.49 was used in the computation of tax.↩
15. Rather, petitioner relies on the argument that respondent has not proven that Newburgh fraudulently underpaid its taxes for the years in issue and therefore the statute of limitation bars assessment of the deficiency. Section 6501(a). We have held in our prior discussion of the tax liability of Anthony and Dorothi Astone that petitioners engaged in a fraudulent scheme whereby corporate receipts were diverted to the Astone's personal accounts or were cashed by Anthony Astone and that their personal expenses were paid out of additional corporate receipts. As will be discussed, infra, such scheme also necessarily resulted in the fraudulent underpayment of Newburgh's taxes. Thus, there is no statute of limitations on the assessment of the instant deficiencies. Section 6501(c)(1)↩.
16. As we previously discussed, for its taxable year ending September 30, 1965, Newburgh reported no gross receipts and claimed no business deductions. However, respondent determined that Newburgh received gross receipts in the amount of $42,243.56 during that year which were deposited in Mr. and Mrs. Astone's personal accounts. Respondent further determined that Newburgh was entitled to business expenses in the amount of $26,740.17, computed by reference to the average net profit percentage of 36.7 percent of Newburgh for the taxble years ending September 30, 1967, through September 30, 1971. Petitioner argues on brief that evidence was presented which established the average percentage of profit and the average ratio of expenses to income in the moving and storage business and that such figures were substantially lower than the 36.7 net profit percentage determined by respondent. The evidence referred to consists of a study published by the National Furniture Warehousemen's Association. We attach no weight to this study. A national average, even if accurate, has no relevance to the specific issue before us.↩
17. Petitioner argues that records were kept of the expenses incurred but that such records were lost by agents of the respondent. We are not convinced that such records ever existed.↩
18. Section 274(d) provides in pertinent part as follows: No deduction shall be allowed * * * under section 162 * * * for any traveling expense (including meals and lodging while away from home) * * * [or] for any item with respect to an activity which is of a type generally considered to constitute entertainment * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expenses or other item, (B) the time and place of the travel, entertainment * * *, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained * * *.
19. Petitioner argues that only negligence and not fraud was involved in its understatement of taxable income for the taxable years in issue. This negligence, Newburgh contends, was due to: (1) inaccurate methods employed by petitioner's accountant in collecting tax information and in preparing the retunrs; (2) inadequate methods of bookkeeping employed by petitioner; and (3) the lack of communication and exchanging of information between petitioner and its acountant. Unfortunately for petitioner, we do not agree with this characterization of the facts. We believe the record clearly shows that corporate funds were used to pay the Astone's personal expenses and that corporate receipts were deliberately diverted to Mr. and Mrs. Astone's personal accounts in order to prevent the reflection of large amounts of business income on the corporate returns. It is inconceivable that Mr. and Mrs. Astone simply forgot to mention the existence of these additional corporate receipts to their accountant. Rather, we believe that their personal bank records were deliberately concealed from Mr. Diprima.
20. We need not consider the collateral estoppel issue raised by respondent with regard to Newburgh's taxable year ended September 30, 1970, as the clear and convincing evidence of the fraudulent scheme presented by respondent pervades all the taxable years in issue.↩
21. Although the record is not clear on this point, apparently Anthony and Dorothi Astone were married to each other in 1957 but title to the motel was held solely in Dorothi Astone's name. When asked at trial how she acquired title to the motel, she responded "I have no idea." The remainder of her testimony was similarly unenlightening.↩
22. Thus, the assessment of the deficiency against petitioner for 1965 is not barred by the statute of limitations. Section 6501(c)(3)↩.
23. The gain of $15,697.01 was computed by allocating $13,912.50 of the 1957 purchase price to the land and the remaining $39,087.50 to the building. The amount of $8,697.01 was then deducted from the basis of the building as allowed or allowable depreciation under section 1016(a)(2)↩ from December 1957 to the month of sale in May 1965. This computation resulted in an adjusted basis at the date of sale of $44,302.99. This amount was then subtracted form the sale price of $60,000.
24. Clearly, the giving of a mortgage on a piece of property during the period of ownership does not, in itself, increase the basis of the property.↩
25. We note also that many of these alleged improvements constitute depeciable assets. Therefore, any increase in basis would also require an offsetting decrease in basis to take into account the allowable depreciation on said assets. Section 1016(a)(2)↩.